UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
PAUL SHAMBRESKIS,

                Plaintiff,                               **MEMORANDUM &**
                                                           **ORDER**
       -against-                                             02 Civ. 2692 (DRH) (MLO)

BRIDGEPORT AND PORT JEFFERSON
STEAMBOAT COMPANY,

                Defendant.
------------------------------------------------------------X

**APPEARANCES:**

**PAUL SHAMBRESKIS**
Plaintiff Pro Se
390 North 2nd Street, Apt. 102
San Jose, CA 95112

**FREEHILL HOGAN & MAHAR L.L.P.**
Attorneys for Defendant
80 Pine Street,
New York, NY 10005
By: Mark Muller, Esq.

**HURLEY, Senior District Judge**:

*Introduction*

      Plaintiff Paul Shambreskis ("Plaintiff" or "Shambreskis") filed the present suit on May 3, 2002, alleging that Defendant Bridgeport and Port Jefferson Steamboat Company ("Defendant") failed to exercise proper care to prevent injuries that Plaintiff suffered when he was hit by a chock[1] while aboard Defendant's vessel on July 25, 1999. Defendant resists the cause of action

---

[1] A chock is a heavy rubber wedge placed by the tires of automobiles to keep them from moving.

on two grounds. First, Defendant asserts that the action is time-barred as not having been commenced within the one year contractual limitations period.[2] Second, Defendants maintain that there is no evidence that Plaintiff's alleged injuries were proximately caused by the accident.

This case was tried to the Court during July 2007. Set forth below are the Court's (1) rulings on certain evidentiary matters left open during the trial as well as one arising thereafter, and (2) findings of fact and conclusions of law.

*Evidentiary Matters*

During the course of the trial, both Plaintiff and Defendant sought to introduce certain medical records of the Plaintiff without appropriate authentication. The Court granted the parties additional time to submit proper certifications pursuant to Rule 902(11) of the Federal Rules of Evidence.

By letter dated July 30, 2007 (Docket No. 109), Defendant submitted certifications for the Plaintiff's Portland, Oregon VA medical records (Trial Ex. F), Oakland Park VA medical records (Trial Ex. G) and Broward General Hospital records (Trial Ex. H). Having reviewed these

---

[2] Defendant twice moved for summary judgment on its statute of limitations defense. In deciding those motions the Court found that (1) as a matter of law the physical characteristics of the ticket itself reasonably communicated to the passenger the existence therein of important terms and conditions that affected the passenger's legal rights as the limitations language on the ticket was legible, of adequate size, clearly expressed and concise; and (2) walk-on passengers purchase their tickets on the vessel, with the tickets then collected at the end of the trip with the receipt portion containing the relevant time limitation given back to the passenger. However, because of the existence of a question of fact as to when during the relevant ferry ride Plaintiff purchased his ticket, which question of fact was relevant to whether Plaintiff had a meaningful opportunity to become informed of the shortened limitations period, summary judgment was denied. *See* Memorandum and Order, dated March 16, 2004, at 7-9; Memorandum and Order, dated October 30, 2006 at 2-5. In accordance with the Court's ruling on the summary judgment motions, the testimony at trial vis a vis the statute of limitations defense was limited to the issue of when Plaintiff received his ticket and whether he had a meaningful opportunity to become informed of its terms.

certifications, the Court finds that they comply with Rule 902(11) and therefore the medical records are admitted into evidence.

On or about July 31, 2007, the Court received 5 packets of records from the Palo Alto California VA Hospital; four of the packets were labeled medical records and one was labeled administrative records. The records were accompanied by a letter from T. Wes Maynard, Chief, Health Information Management Section which stated:

> I [,] T. Wes Maynard as the Custodian of Records for the Veterans Affairs Palo Alto Health Care System, certify under the penalty of perjury, that the medical records provided for Mr. Paul M. Shambreskis, are photocopies of true, original records kept in the normal course of business by the Department of Veteran Affairs. All such records were compiled in compliance with the order to produce records and no documents have been withheld in order to avoid their being photocopied.

Defendant has objected to the admission of those records in the one packet labeled "administrative" and consisting of (1) July 16, 2007 narrative report prepared by Dr. Stephen Skirboll; (2) January 19, 2007 report prepared by Dr. Roger Klima; (3) January 2, 2007 narrative report prepared by Dr. Martha Losch; and (4) May 31, 2007 narrative report prepared by Dr. Marina Martin. The basis of the objection is threefold: they are not part of Plaintiff's medical records, they lack proper certification and they were obviously prepared for purposes of litigation.

In an apparent attempt to meet Defendant's objections, Plaintiff had the following August 30, 2007 letter from Mr. Maynard sent to the Court:

> I [,] T. Maynard as the Custodian of Records for the Veterans Affairs Palo Alto Health Care System, certify under the penalty of perjury that the medical records provided for Mr. Paul Shambreskis, are photocopies of true original records kept in the

> normal course of business by the Department of Veteran Affairs. All such records were compiled in compliance with the order to produce records and no documents have been withheld in order to avoid their being photocopied.
>
> Judge Hurley, enclosed correspondences are medical narratives summarizing the treatment and care of Mr. Paul M. Shambreskis, which have been scanned into the medical record. Scanned documents are an intricate component of the electronic health record and are utilized in the medical decision process.

Enclosed with the letter are the four "administrative" records set forth above.

The Court upholds Defendant's objection to the "administrative" records and excludes them from evidence. First, the records have not been properly authenticated under Rule 902(11) of the Federal Rules of Evidence.[3] Rule 902(11) requires that the certification state that the record:

> (A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters;
> (B) was kept in the regular course of the regularly conducted activity; and
> (C) was made by the regularly conducted activity as a regular practice.

Fed. R. Evid. 902(11). The certification only addresses the requirement that the records be kept in the regular course of business. Conspicuously absent is a statement that the records were made "at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters." This failure to meet the first of the rule's requirements mandates exclusion of the proffered records. *Cf. United States v. Strother*,

---

[3] While the four packets of "medical" records sent under cover of July 26, 2007 suffer from the same defect in authentication, Defendant does not object to the admission of those records into evidence and therefore they are admitted.

49 F.3d 869, 874 (2d Cir. 1995) (holding that proffered business records must meet all the requirements of the exception to be admissible). Plaintiff was provided with a copy of Rule 902(11) by the Court. His pro se status "does not exempt [Plaintiff] from compliance with relevant rules of procedural and substantive law." *Triestman v. Fed'l Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).

Moreover, these "administrative" records are excludable as they appear to have been prepared for purposes of litigation and not in the ordinary course of business. *See Messer v. Bd. of Educ. of City of New York*, 2007 WL 136027, *7 n.11 (E.D.N.Y. Jan. 16, 2007) (citing *Potamkin Cadillac Corp. v. BRI Coverage Corp.*, 38 F.3d 627, 632 (2d Cir. 1994). For example, the May 31, 2007 narrative prepared by Dr. Martin states in pertinent part:

> Mr. Paul Shambreskis, DOB 2/22/52, has asked me as his primary care physician to prepare a narrative summary of his medical care Hospital [sic] to date at the Palo Alto Veteran's Administration Hospital following an accident in 1999. This summary was prepared based on review of his medical records from the Veteran's Administration hospital. Mr. Shambreskis has been my primary care patient for approximately 9 months. The review of his psychiatric care for depression and anxiety has been prepared separately by his psychiatrist.

Finally, the Court notes that to the extent Plaintiff offers these documents is an effort to provide medical evidence of causation, *see generally Barnes v. Anderson*, 202 F.3d 150, 159 (2d Cir. 1999) (stating the when a plaintiff is claiming that a physical injury was caused by an act of the defendant, medical testimony is often required "because the medical effect on the human system of the infliction of injuries is not generally within the sphere of the common knowledge of the lay person"), they do not, in fact, provide evidence of causation. Nowhere in the narratives do any of the doctors opine that Plaintiff's complaints are consistent with the history provided,

i.e. being struck on the head with a chock or other object.  It is apparent that the doctors' attribution of Plaintiff's maladies to the July 1999 chock accident are based solely upon Plaintiff's claim that these symptoms began after, and were caused by, the ferry incident.  The July 16, 2007 narrative of Dr. Skirboll states in relevant part : [Plaintiff] was first seen in our clinic by one of my colleagues on August 25, 2000 . . . . At that first visit, Mr. Shambreskis stated that these symptoms began after he was hit in the head by a heavy object in 1999."  Dr. Klima's January 19, 2007 narrative states: "[Plaintiff] was seen in PM&R clinic on 11/01/02 . . . . At that time patient stated that he was having problems with his low back and neck since 7/99 when he fell off a ferry boat after being hit in the head.  He stated that initially he had a concussion and than [sic] developed some cervical and lumbar problems."  Dr. Losch's January 2, 2007 narrative provides: "Mr. Shambreskis was referred to me at this VA in 2000 for anxiety symptoms resulting from the accident of July 25, 1999 when a tire fell on him while he was riding on a ferry."  Finally, Dr. Martin's May 31, 2007 narrative states: "On August 30, 1999, Mr. Shambreskis called the Telephone Care program at the Palo Alto VA hospital saying that he has been hit in the head by a heavy rubber object while on a ferry in New York in July 1999."

In sum, the Defendant's Exs. F, G, and H and the four packets of Plaintiff's records denoted "medical" are admitted into evidence but Plaintiff's records denoted "administrative" are excluded.

One other evidentiary matter must be addressed.  Under cover letter dated October 9, 2007, Plaintiff submitted two packets.  One packet contains what purports to be "Trial Exs. 15 through 25"; the other packet contains "business and character references."  The Court's review of the trial transcript reveals that these documents were not offered into evidence by Plaintiff

during the trial nor was there any discussion regarding their submission after the conclusion of testimony. The only discussion was concerning allowing the parties an opportunity to submit proper authentications for the medical records that had been offered into evidence during the trial. The parties rested and the record was closed except for the Rule 901(11) certifications. On this basis alone, these two packets are excluded. The Court also notes that the documents submitted by Plaintiff are not authenticated, were prepared for litigation and/or are rank hearsay. Accordingly, the documents denoted "Trial Exs. 15 through 25" and business and character references are excluded from evidence and shall not be considered by the Court with one exception. The document denoted "Trial Ex. 15" consists of medical records from Stony Brook hospital which were offered and accepted into evidence as Defendant's Ex. K and, accordingly, those records have been considered by the Court.

Having addressed the outstanding evidentiary matters, the Court shall proceed to its findings of fact and conclusions of law.

*Findings of Fact and Conclusions of Law*

**Jurisdiction**

1. At all relevant times, Plaintiff was a resident of California.

2. At all relevant times Defendant operated a ferry service from Port Jefferson, Long Island, New York to Bridgeport, Connecticut.

**The Statute of Limitations Defense**

3. On or about July 18, 1999, Plaintiff came to New York on business. While in New York he stayed at a hotel located in Ronkonkoma, Long Island, New York.

4. During this business trip, Plaintiff decided to visit his parents who reside in Connecticut and, traveling alone, took Defendant's ferry as a walk on passenger from Port Jefferson to Bridgeport; during that ferry ride, the exact date of which is unknown, Plaintiff purchased a ticket after he boarded the ferry.

5. In accordance with Defendant's practice, Plaintiff received the larger, receipt portion of his ticket when he exited the ferry in Bridgeport.

6. On July 25, 1999, Plaintiff boarded one of Defendant's ferries, the Grand Republic, in Bridgeport as a walk-on passenger for the return trip to Long Island.

7. Defendant has offered credible evidence that there is a ninety-seven (97%) percent statistical probability that Plaintiff purchased his ticket no later than fifty-six (56) minutes prior to the accident. Plaintiff's trial testimony regarding when he purchased the return trip ticket was contradictory to the point of being unbelievable. Plaintiff first testified that he purchased the ticket when he boarded the ferry and before the ferry left Bridgeport. Then he testified that he did not know when he purchased the ticket. Lastly, he testified that he did not purchase a ticket until the end of the trip. (*See*, *e.g.*, Tr. at 80-81, 118, 123.) Plaintiff's conflicting testimony is insufficient to call into doubt Defendant's statistical evidence. Accordingly, the Court finds that it is more likely than not that Plaintiff purchased his ticket so that he had possession of the ticket for approximately fifty-six (56) minutes before the accident at issue.

8. Having received his ticket approximately one hour before the accident, Plaintiff had a meaningful opportunity to become informed of the terms of the ticket, including the contractual limitations period.

9. Plaintiff had also received the receipt portion of a ticket on the trip over to Bridgeport to visit his parents. He therefore had additional time to read that ticket and become informed of the terms of the ticket before his return trip to Port Jefferson and before the accident occurred.

10. As that portion of the ticket containing the limitation on the time to commence suit is returned to the passenger, Plaintiff had additional time after the accident to become informed of the terms of the ticket by review of either the ticket purchased on the trip to Bridgeport or the ticket purchased for his return from Bridgeport to Port Jefferson.

11. A sea carrier is permitted "to contractually limit the period in which a suit for injuries may be filed provided that the time period is at least one year" and "the carrier reasonably communicates the existence and importance of the limitation to the passenger." *Ward v. Cross Sound Ferry*, 273 F.3d 520, 523 (2d Cir. 2001) (citing *Spataro v. Kloster Cruise, Ltd.,*, 894 F.2d 44, 45 (2d Cir. 1990) (per curiam)). In applying this standard, the Second Circuit has adopted a two-part test:

> (1) whether the physical characteristics of the ticket itself "reasonably communicate[d] to the passenger the existence therein of important terms and conditions" that affected the passenger's legal rights, and (2) whether "the circumstances surrounding the passenger's purchase and subsequent retention of the ticket/contract" permitted the passenger "to become meaningfully informed of the contractual terms at stake."

*Ward*, 273 F.3d at 523 (quoting *Shankles v. Costa Armatori, S.P.A.*, 722 F.2d 861, 864-66 (1st Cir. 1983)).

12. Both elements have been satisfied. Accordingly, Plaintiff was required to commence any action for personal injuries within one-year from the date of the accident.

**The Accident**

13. Plaintiff testified that while waiting in line to disembark in Port Jefferson, a rubber chock came in contact with him, hitting him on the head. Plaintiff has no clear memory of the accident or how or why the rubber chock came in contact with him. As noted in the records of a medical visit on September 9, 1999, Plaintiff stated that the chock "may have just brushed him." After being hit, he recalls someone yelling "I'm sorry" but does not know whether that someone was a passenger or a crew member.

14. Plaintiff did have the presence of mind to ask to fill out an accident report as he was leaving the ferry. He did, in fact, fill out a "Report of Accident." According to that report, a passenger was driving up the ship's ramp, hit a chock knocking it off the ramp and hitting Mr. Shambreskis on the head.

15. Plaintiff walked off the ferry after he came in contact with the chock. He did not lose consciousness, and there was no bleeding, bruising or swelling. Plaintiff did not seek immediate medical attention. It was not until three days later, July 28, 1999, that Plaintiff went to Stony Brook Hospital.

**The Medical Evidence**

16. As reported in the records of Stony Brook Hospital, Plaintiff had no loss of consciousness and was not disorientated. There was no evidence that he sustained a concussive blow of any sort. A CT scan and MRI were taken; the result of both were normal.

17. Shortly after the accident, Plaintiff drove cross-country from Long Island back to California. He did not seek any additional medical attention until August 30, 1999 when he arrived in California.

18. On August 30, 1999, Plaintiff went to the Palo Alto California VA Hospital. According to the records of that examination, no gross head tenderness or ecchymosis was noted. The examination of Plaintiff's neck revealed no spine pain and a full range of motion. The records do state that Mr. Shambreskis was complaining of momentary sharp head pains, dizziness and feeling dazed, but there is no mention of any lower back complaints or injuries.

19. Defendant's expert, Dr. David Dickoff, testified that sharp head pains, dizziness and feeling dazed commonly occur in patients who take Amitriptyline and Plaintiff had been taking that and other medications for many year prior to the accident to combat anxiety. The Court finds Dr. Dickoff a credible witness and accepts his explanation for Plaintiff's August 30, 1999 complaints.

20. Plaintiff claims that as a result of the July 25, 1999 accident, he sustained physical, psychological, psychiatric and cognitive injuries. However, Plaintiff did not call any doctors or medical experts at trial. Moreover, Plaintiff's medical records do not support his claims.

21. With respect to Plaintiff's claim that the accident caused injuries to his neck and lower back and that his lower back surgeries in May 2003 and November 2005 were necessitated by the accident, the evidence does not support a causal relationship. As testified to by Dr. Dickoff, there is no mention of lower back pain in Plaintiff's post accident medical records until September 2000. These records attribute the lower back problems to degenerative disc and/or joint disease. Nor is there any mention of neck pain until three months after the accident. Dr. Dickoff opined that these neck and lower back

problems were not caused by the accident but rather were the natural progression of the pre-accident disease process. The Court finds Dr. Dickoff's testimony in this regard credible and adopts his opinion that there is no causal relationship between the accident and Plaintiff's neck and lower back problems.

22. Similarly, the medical evidence does not support Plaintiff's claim that his right arm and hand problems resulted from the accident. Plaintiff was diagnosed with carpal tunnel syndrome before the accident and had surgery in April 1999 for chronic ulnar neuropathy in his right arm.

23. Nor does the evidence support Plaintiff's claim of psychological, psychiatric and cognitive problems as a result of the accident. Medical records from the Palo Alto California VA Hospital specifically state that Plaintiff's cognitive difficulties were caused by his pre-existing severe psychiatric symptomatology. Defendant's expert, Dr. Mark Rubenstein, whom the Court found very credible, testified that his review of Plaintiff's medical records indicated that Plaintiff suffered from depression and anxiety disorder for many years prior to the accident. Dr. Rubinstein opined that Plaintiff's profound psychiatric and psychological problems are not related to the accident. With respect to Plaintiff's claimed cognitive impairments Dr. Rubenstein testified as follows:

> The importance and relevance of him basically having claimed a total global amnestic syndrome, being unable to recall events from long ago or as recently as a week ago, is extraordinarily unusual. It's really never seen in the annals of neuropsychiatric practice where a person sustains a mild TBI, that's a traumatic brain injury, without evidence of a subdural hematoma or epidural hematoma or crush or penetrating injury to the brain where you can have total impairment or even death, of course.

> What we see uniformly in mild traumatic grain injury where there is a loss of consciousness, where there may be retrograde amnesia is characteristically difficulty with immediate recall and very recent recall of events, because these are events that have not been deeply encoded within the memory banks of the superior temporal gyrus of the brain; therefore, they are most vulnerable to being lost and not retained. Characteristically, patients like this can't remember what they did today or yesterday but they can tell you all kinds of details from 25 or 30 years ago. You don't see somebody with this global amnestic syndrome. . . . You would also expect the memory difficulty to resolve over the course of between six weeks and six months, sometimes as long as 18 months for post-concussional cognitive difficulties to resolve but they resolve either completely or overwhelmingly 80, 90, 90 percent. You don't see them getting worse in time. That's not the natural history of these kinds of concussive injuries. you see them getting better in time.

(Tr. at 182-83). The Court adopts Dr. Rubenstein's opinion that Plaintiff's psychiatric and psychological problems are not related to the ferry accident.

**<u>Credibility</u>**

24. The Court finds that Plaintiff was not a credible witness. His testimony was replete with inconsistencies and contradictions. As noted above, he initially testified that he purchased his ticket for the return trip to Long Island when he first boarded the ferry in Bridgeport. Later, he changed his testimony and averred, falsely in the Court's opinion, that he purchased it only two or three minutes before the accident. Several other examples, set forth below, are sufficient to demonstrate the Plaintiff's lack of credibility, although these examples are by no means exhaustive.

25. At trial, Plaintiff denied having any lower back pain or neck pain prior to the ferry accident. He testified that, in fact, he was in excellent physical condition prior to the accident:

> Plaintiff: I did not need a cane to walk. For a period of at least a couple of years, I actually was jogging and speed walking with my friend, Raul Ibarra.
> The Court: And when was that?
> Plaintiff: Well, all my life, but most recently, two years before the accident up until I got hurt.
> The Court: So that would have been continuous from - - going back two years from July of '99?
> Plaintiff: Yes, your Honor.
> The Court: Okay.
> The Witness: I worked out all my life and played sports. I continually went to the gyms every other day, primarily using the Nautilus-type machinery. . . .

Tr. at 54.

26. According to Plaintiff's medical records, however, Plaintiff was in two head-on motor vehicles collisions, both of which pre-dated the July 1999 accident at issue. In one accident, he was thrown from his car and suffered a head injury with a loss of consciousness, as well as injuring his knee and back. In the second accident, he injured his left shoulder and herniated discs in his lower neck and back. (*See* Tr. 205-06.) According to his medical records from the Oakland Park VA Hospital, between August 1989 to February 1997, he complained of shoulder, back and neck pain, among other things and was diagnosed with arthritis, chronic anxiety and depression due to multiple muscle and skeletal injuries.

27. At trial, Plaintiff also denied any psychiatric or psychological problems prior to the ferry accident. His medical records flatly contradict this testimony. Plaintiff was in psychiatric treatment from April 1998 to January 1999. Prior to the ferry accident, he was diagnosed with panic disorder with agoraphobia, generalized anxiety disorder, social phobia and pain disorder at the VA Hospital in Portland Oregon.

**Plaintiff Has Not Sustained His Burden of Proof on Negligence Claim**

28. The asserted basis for jurisdiction in this Court is diversity. "Under New York law, a plaintiff must establish the following elements for a negligence claim: (1) defendant owed plaintiff a duty of care; (2) defendant breached that duty; and (3) the breach proximately caused plaintiff's injury." *Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 531 (S.D.N.Y. 2007); *accord Colorado Capital v. Owens*, 227 F.R.D. 181, 187 (E.D.N.Y. 2005).

29. While it appears to this Court that jurisdiction is also proper under federal maritime law, the Court need not decide the issue because the elements of a negligence claim are the same under New York and maritime law. *See In re Cornfield*, 365 F. Supp. 2d 271, 276 (E.D.N.Y. 2004), *aff'd*, 156 Fed. Appx 343 (2d Cir. 2005) ("Negligence under maritime law contains the same elements as under common law. . . . Claimants must establish duty, breach of duty, and causation.").

30. The Court has subject matter jurisdiction over this matter.

31. Defendant owed Plaintiff a duty of care.

32. Based on the evidence adduced, it is unclear how the accident occurred and if, indeed, Plaintiff was hit in the head with a chock.

33. Plaintiff has not sustained his burden of proving that Defendant breached that duty of care.

34. Assuming arguendo that a duty of care was breached, Plaintiff has not sustained his burden of proving that such breach was the proximate cause of his injuries.

**The Court Finds In Favor of the Defendant**

35. Plaintiff has failed to sustain his burden of proving that his injuries were proximately caused by Defendant's breach of a duty of care.

36. Moreover, the alleged accident having occurred on July 25, 1999 and this action not having been commenced until May 3, 2002, this action is time barred.

*Conclusion*

For the reasons set forth above, the Court finds in favor of the Defendant and against the Plaintiff. The Clerk of Court is directed to enter judgment accordingly and, upon entry of judgment, to close this case.

    **SO ORDERED.**

Dated: Central Islip, New York
       May 8, 2008                          /s/
                                                       Denis R. Hurley
                                                       Unites States Senior District Judge